BOWNES, Senior Circuit Judge.
In this case, we consider whether a Maine statute providing for affordable prescription drugs can survive facial constitutional challenges. On October 26, 2000, the district court issued a preliminary injunction preventing the implementation of the statute on the ground that it is preempted by the Supremacy Clause and violates the dormant Commerce Clause. We reverse.
I. BACKGROUND
On May 11, 2000, the Governor of Maine signed into law an Act to Establish Fairer Pricing for Prescription Drugs, 2000 Me. Legis. Ch. 786 (S.P.1026) (L.D.2599) (the “Act”), which establishes the “Maine Rx Program” (the “Program”).[1]
The statute was enacted because of the Maine Legislature’s concern that many Maine citizens who were not Medicaid recipients could not afford necessary prescription drugs. It is predicated on the economic reality that volume buying of prescription drugs by Medicaid administrators, insurance companies and health maintenance organizations (“HMOs”) resulted in substantially lower prices for these entities than for individual purchasers. A minority staff report for the United States House Committee on Government Reform and Oversight found that the average retail price for individual elderly purchasers was 86 percent higher than the price charged to the federal government and other favored customers, such as HMOs.
The Program is open to all State residents, and allows enrollees to purchase prescription drugs from participating Maine pharmacies at a discounted price. The discount offered by the pharmacies is reimbursed by the State out of a dedicated fund created with the money raised from “rebate payments” collected from participating drug manufacturers. Me.Rev.Stat. Ann. tit. 22, § 2681. The obligation to pay the “rebate” is triggered by the retail sale of the manufacturer’s drugs to a Program enrollee through a participating pharmacy.
The Act directs the Commissioner of Maine’s Department of Health Services to negotiate rebate agreements with manufacturers. Id. § 2681(3). These rebate agreements are similar in form to the rebate agreements required of manufacturers participating in the Maine Medicaid outpatient drug program. Id. § 2681(4). In negotiating the rebate, the Commissioner is directed to “consider” the rebate amount calculated under the Federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8, and to use his or her “best efforts” to obtain an initial rebate in the same amount. Me.Rev.Stat. Ann. tit. 22, § 2681(4)(A)-(C). Rebate payments are made quarterly on the basis of retail sales records for that quarter. Id. § 2681(3).
In order to create an incentive for manufacturers to enter rebate agreements with the Commissioner, the Act provides that names of manufacturers who do not *72 enter into agreements be released to health care providers and the public. Id. § 2681(7). More importantly, the drugs of all noncompliant manufacturers are required to be subject, “as permitted by law,” to the “prior authorization requirements” in the State Medicaid program. Id. § 2681(7). When subjected to prior authorization, a drug may not be dispensed to a Medicaid beneficiary without the approval of the State Medicaid administrator.
The plaintiff-appellee, Pharmaceutical Research & Manufacturers of America (“PhRMA”), brought an action in the United States District Court in the District of Maine against defendant-appellants Commissioner of the Maine Department of Human Services and the Maine Attorney General, challenging the constitutionality of the Act. PhRMA claimed that the Act violated the dormant Commerce Clause and was preempted by the federal Medicaid statute under the Supremacy Clause, and moved for a preliminary injunction to prevent the implementation of the Act.
The district court issued the preliminary injunction and found the Act unconstitutional on the two asserted grounds. First, the district court held that the Act had an impermissible extraterritorial reach by regulating the revenues out-of-state pharmaceutical manufacturers receive when selling to out-of-state pharmaceutical distributors, thereby violating the dormant Commerce Clause. As to those distributors located in the State of Maine, the district court held that the Act was preempted under the Supremacy Clause because it conflicted with the federal Medicaid program.[2]
II . DISCUSSION
A. Standard of Review
“The criteria for the grant of a preliminary injunction are the familiar four: likelihood of success, risk of irreparable harm, the balance of equities and the public interest.” Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir.2000) (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996)). When a district court’s grant of a preliminary injunction is appealed, our standard of review depends on the issue under consideration: we review pure issues of law de novo, findings of fact for clear error, and “judgment calls” with considerable deference. Id. (noting that our standard of review is sometimes summarized as being for “abuse of discretion”).
The district court concluded that PhRMA’s likelihood of success on the merits of most of its constitutional challenges was “overwhelming.” Accordingly, it dealt only cursorily with the remaining preliminary injunction factors. Our review also focuses on PhRMA’s likelihood of success on the merits of its challenges under the Supremacy Clause and the Commerce Clause. See Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir.1993) (stating that the “sine qua non” of preliminary injunction analysis is whether plaintiff is likely to succeed on merits of claim).
B. Standing
The initial question we face is whether PhRMA has prudential standing *73 to challenge the prior authorization provision of the Act. PhRMA contends that Maine’s standing argument was not briefed to the district court, and therefore was waived. We assume, without deciding, that Maine may assert this standing challenge on appeal, and hold that PhRMA falls within the relevant “zone of interest.”[3]
The Supreme Court recently reiterated the standard for determining prudential standing:
[I]n applying the “zone of interests” test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff. Instead, we first discern the interests “arguably ... to be protected” by the statutory provision at issue; we then inquire whether the plaintiffs interests affected by the agency action in question are among them.
Nat’l Credit Union Admin. v. First Nat’l Bank & Trust Co., 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998).
Maine contends that PhRMA’s interest is purely financial and is limited to ensuring that its members’ drugs are prescribed instead of competitors’ drugs. Nothing in the Medicaid statute, Maine argues, suggests that Congress intended to protect sales of any particular drugs. See TAP Pharms. v. U.S. Dep't of HHS, 163 F.3d 199, 208 (4th Cir.1998) (holding that pharmaceutical manufacturer lacked standing to challenge Medicare rules reducing reimbursement amounts paid for their products because manufacturer’s financial interests were not within zone of interests protected by Medicare).
PhRMA has not asserted an action to enforce rights under the Medicaid statute, however, but rather a preemption-based challenge under the Supremacy Clause. In this type of action, it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue. St. Thomas-St. John Hotel & Tourism Ass’n v. Virgin Islands, 218 F.3d 232, 241 (3d Cir.2000). As the Third Circuit recently pointed out, an entity does not need prudential standing to invoke the protection of the Supremacy Clause:
We know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption. On the contrary, a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption.
Id. Thus, regardless of whether the Medicaid statute’s relevant provisions were designed to benefit PhRMA, PhRMA can invoke the statute’s preemptive force. Cf. Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor, 107 F.3d 1000, 1006 (2d Cir.1997) (concluding that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate federal law).
*74 Given that PhRMA has prudential standing grounded in the Supremacy Clause, we think it may fairly assert the rights of Medicaid recipients for purposes of this action. Where a party has established a concrete injury in fact, and otherwise has standing to challenge the lawfulness of the statute, it is “entitled to assert those concomitant rights of third parties that would be ‘diluted or adversely affected’ should [its] constitutional challenge fail and the statute[ ] remain in force.” Craig v. Boren, 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (quoting Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). Accordingly, “vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek'access to their market or function.” Id.; see also 1 L. Tribe, American Constitutional Law, § 3-19, p. 438 (3d ed.2000).
C. Preemption
Having decided that PhRMA has standing to challenge the Maine Act on preemption grounds, we now turn to the merits of that argument. The district court addressed preemption only with regard to the Act’s regulation of sales to instate distributors, after concluding that such regulation would not be barred by the Commerce Clause. It held that the prior authorization review requirement of the Act, Me.Rev.Stat. Ann. tit. 22, § 2681(7), conflicted with the purposes of the Medicaid program such that the requirement was invalid under the Supremacy Clause.[4] If we affirm the district court’s preemption holding, it would invalidate the Act as to all distributors, not just those who operate in Maine, and would obviate the need to address the Commerce Clause. Therefore, we analyze the issue of preemption first.[5]
Under the Supremacy Clause, a federal law may expressly or impliedly preempt state law. U.S. Const. art. VI, cl. 2 (stating that federal law “shall be the supreme law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding”). As the parties agree, only “implied conflict preemption” is at issue here.[6] Our task, therefore, is to consider if “compliance *75 with both state and federal regulations is impossible” or if “state law interposes an obstacle to the achievement of Congress’s discernable objectives.” Grant’s Dairy-Me., LLC v. Comm’r of Me. Dep’t of Agric., Food & Rural Res., 232 F.3d 8, 15 (1st Cir.2000) (citing Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)).
In doing so, we assume “that the historic police powers of the States [are] not to be superceded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.” Id. at 14-15 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). We also recognize that federal preemption of a state law is “strong medicine,” and is “not casually to be dispensed.” Id. at 18. This is especially true when the federal statute creates a program, such as Medicaid, that utilizes “cooperative federalism”: “Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one.” Wash., Dep’t of Soc. & Health Servs. v. Bowen, 815 F.2d 549, 557 (9th Cir.1987) (quoting N.Y. Dep’t of Soc. Servs. v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973)).
To determine whether the state regulation is consistent with the federal statute, we examine the “structure and purpose of the [federal] statute as a whole.” Gade, 505 U.S. at 98, 112 S.Ct. 2374. The primary purpose of Medicaid is to enable states to provide medical services to those whose “income and resources are insufficient to meet the costs of necessary medical services.... ” 42 U.S.C. § 1396 (2000). Congress expressly intended that the provision of medical services be administered by the state “in a manner consistent with simplicity of administration and the best interests of the recipients.” Id. § 1396a(a)(19).
We perceive no conflict between the Maine Act and Medicaid’s structure and purpose. Neither the letter nor the intent of the Medicaid statute prevents states from imposing prior authorization requirements; indeed, they are explicitly permitted. 42 U.S.C. § 1396r-8(d)(1)(A) (states may “subject to prior authorization any covered outpatient drug”). The statute sets forth only two limitations on a state’s use of prior authorization: the state must provide “response by telephone or other telecommunication device within 24 hours of a request for prior authorization;” and, with respect to most drugs, provide for “the dispensing of at least 72-hour [sic] supply of a covered outpatient prescription drug in an emergency situation (as defined by the Secretary).” Id. § 1396r-8(d)(5)(A) and (B).
The plain text of the Maine Act appears to incorporate these Medicaid requirements. It provides: “The department shall impose prior authorization requirements in the Medicaid program under this Title, as permitted by law, for the dispensing of prescription drugs.... ” Me.Rev.Stat. Ann. tit. 22, § 2681(7) (emphasis added). We read the language “as permitted by law” to limit the Act’s application to only those situations in which prior authorization is permitted by Medicaid.[7] As the Department is charged with administering the Maine Rx Program, we owe deference to its interpretation of the Act. Fireside Nissan, Inc. v. Fanning, 30 F.3d 206, 212 (1st Cir.1994).
*76 Moreover, as set forth in the affidavit of Kevin Coneannon, Commissioner of the Maine Department of Human Services, Maine has proposed administrative rules governing prior authorization aimed at ensuring that Medicaid recipients will have access to needed medications. Specifically, the decision to place a drug on the prior authorization list may be made only by the State’s Medicaid Drug Utilization Review [DUR] Committee, which exclusively comprises physicians and pharmacists licensed to prescribe or dispense medications in Maine. Coneannon states:
In making its determination of whether or not a prior authorization requirement is clinically appropriate, the DUR Committee shall be guided by the law of Medicaid, and particularly the principle that Medicaid recipients shall be assured access to all medically necessary prescription drugs.
PhRMA contends that prior authorization, however implemented, necessarily interferes with the delivery of Medicaid services by placing an administrative burden on physicians and patients. This interference is acceptable, it says, when performed in the usual course of the Medicaid regulations concerning prior authorization, 42 U.S.C. § 1396r-8(d)(5), because there is a countervailing “legitimate” purpose of preventing abuse or overprescription of certain expensive medications. In the case of a prior authorization under the Maine Rx Program, however, PhRMA argues (and the district court agreed) that there is no “Medicaid purpose” or “benefit” to Medicaid that offsets the interference. Hence, it contends, only when a prior authorization is motivated by the refusal to enter into a Maine Rx Program rebate agreement is it preempted.
This argument is unpersuasive. First, we are not convinced that the Medicaid statute is concerned with the motivation behind imposing prior authorization, as long as the 24-hour response and the 72-hour drug-supply requirements, 42 U.S.C. § 1396r-8(d)(5), are satisfied. Thus, even if the district court’s conclusion that “Maine can point to no Medicaid purpose in this new prior authorization requirement” is true, it does not necessarily mean that the prior authorization scheme conflicts with the objectives of the Medicaid program. We see no basis for inflicting the “strong medicine” of preemption on a state statute that, in the absence of an actual conflict, merely fails to directly advance the purpose of the federal program.
Moreover, even assuming that this inquiry into the underlying objectives of the Act is appropriate, we disagree that the Act serves no purpose related to Medicaid. The purposes of the Medicaid statute, read broadly, are consonant with the purposes of the Maine Rx Program. First, the Maine Rx Program furthers Medicaid’s aim of providing medical services to those whose “income and resources are insufficient to meet the costs of necessary medical services,” 42 U.S.C. § 1396, even if the individuals covered by the Maine Rx Program are not poor enough to qualify for Medicaid. Second, there is some evidence in the record that by making prescription drugs more accessible to the uninsured, Maine may reduce Medicaid expenditures. When people whose incomes fall outside Medicaid eligibility are unable to purchase necessary medication, their conditions may worsen, driving them further into poverty and into the Medicaid program, requiring more expensive treatment that could have been avoided had earlier intervention been possible. See Stephen B. Soumerai, Sc.D., Dennis Ross-Degnan, Sc.D., Inadequate Prescriptiortr-Drug Coverage for Medicare Enrollees — A Call to Action, New England Journal of Medicine, Vol. 340, No. 9, March 4, 1999 (contained in district court *77 record); Minority Staff Report, Prescription Drug Pricing in the 1st Congressional District of Maine: Drug Companies Profit at the Expense of Older Americans, Committee on Government Reform and Oversight, U.S. House of Representatives, prepared for Rep. Thomas H. Allen, October 9,1998 (same).[8]
Thus, we disagree with the district court’s statement that “If Maine can use its authority over Medicaid authorization to leverage drug manufacturer rebates for the benefit of uninsured citizens, then it can just as easily put the rebates into a state program for highway and bridge construction or school funding.” Neither highway construction nor school funding relate in any way to the purposes of providing medical services to the needy, see 42 U.S.C. § 1396, or of cost-effective administration of the Medicaid program, see id. § 1396a(a)30(A) (state plans must assure that payments are consistent with, inter alia, efficiency and economy).
PhRMA further contends that the Maine Rx Program will necessarily harm Medicaid recipients by impeding access to their doctors’ first-choice medications. The district court agreed with this argument, concluding that the Maine Act conflicted with the Medicaid provision setting forth a general requirement that a state Medicaid plan contain safeguards to assure that care and services will be provided “in a manner consistent with ... the best interests of the recipients.” 42 U.S.C. § 1396a(a)(19). PhRMA vigorously presses the argument that the prior authorization provision is more than a de minimus obstacle to achieving these best interests of the Medicaid recipient because it will effectively require a doctor to shift to her second choice drug where the first choice drug is manufactured by a company that does not participate in the rebate program. The state concedes that it will not authorize payment for the first-choice drug manufactured by a non-participant where there is another drug for the ailment manufactured by a participant, but insists that the Medicaid recipient will always receive medically necessary drugs. At this point in the proceedings, we find insufficient basis for concluding that the Maine Act, on its face, controverts the Medicaid goal of “best interests.”
Because this is a facial challenge to a statute, PhRMA has a difficult burden of showing that Medicaid recipients will be harmed by the Maine Rx Program. “A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). “The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute.” Rice v. Norman Williams Co., 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982).
Here, the parties submitted competing affidavits discussing whether the Maine Rx Program will necessarily inflict harm on Medicaid patients. Dr. Scott Howell, Vice President of National Accounts, Managed Care, SmithKIine - Beecham Corporation, states that “when used wrongly,” prior authorizations hurt medical professionals and patients by adding administrative bur *78 dens, delays, anxiety and confusion. He opines that the Maine Rx Program “will create a high likelihood” of harm by leading to inappropriate prescribing of medications, needlessly burdening doctors, and causing unnecessary inconvenience for Medicaid recipients. “[Pjrior authorization of drugs, without regard to safety or efficacy, will lead to drugs being prescribed that are less safe and efficacious.”
Dr. Timothy S. Clifford, the Medical Director for the Maine Bureau of Medical Services, which administers the Medicaid program, disagrees with Dr. Howell’s affidavit on several points. He contends that the Department will address safety and efficacy concerns in administering the Maine Rx Program’s prior authorization requirement; that it will consider the availability of alternative drugs in deciding whether to subject a particular drug to the requirement; and that Medicaid recipients will continue to have access to medically necessary drugs. Dr. Clifford states: “The Department certainly will not subject any single-source drug that fulfills a unique therapeutic function to the prior authorization process, regardless of whether the manufacturer participates in the Maine Rx Program.... ”
Dr. H. Burtt Richardson, Jr., a Maine pediatrician and Maine Medicaid provider, states that he supports the Maine Rx Program “so long as the decision to put a prior authorization on particular drugs is clinically appropriate, feasible for a medical office, and accompanied by the assurance that all Maine Medicaid recipients have access to medically necessary drugs.”
These affidavits, along with other materials in the record, fall short of establishing that the Act will inflict inevitable or even probable harm on Medicaid patients or their providers. In reviewing a preemption-based facial challenge, “we do not rest our decision on consequences that, while possible, are by no means predictable.” Dep’t of Taxation and Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 69, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994). There is no evidence that the prior authorization procedure is likely to foreclose a patient from receiving a necessary drug. Although prior authorization review is triggered by a manufacturer’s refusal to participate in the Maine Rx Program, the record indicates that the final decision to require prior authorization for a particular drug is based primarily on clinical criteria applied by health care professionals.
Since both sides agree that the prior authorization requirement is the “hammer” or “force” that coerces manufacturers to enter into the Program, the possibility that first-choice drugs will not be readily approved where second-choice inferior alternatives exist concerns us. The possibility that the administrative implications of the prior authorization requirement will affect the quality of medical care for Medicaid recipients in more subtle ways, i.e. through inconveniencing prescribing physicians, also concerns us. Dr. Howell’s affidavit, however, is controverted by the affidavits of other qualified individuals. We simply cannot say on this record that the Act conflicts with Medicaid’s requirement that state Medicaid plans assure that care will be provided in a manner consistent with the recipients’ best interests. 42 U.S.C. § 1396a(a)(19).
This decision is without prejudice to PhRMA’s right to renew its preemption challenge after implementation of the Act, should there be evidence that Medicaid recipients are harmed by the prior authorization requirement “as applied.” See United States v. Hilton, 167 F.3d 61, 71 (1st Cir.), cert. denied, 528 U.S. 844, 120 S.Ct. 115, 145 L.Ed.2d 98 (1999) (“It makes little sense to strike down an entire statute in response to a facial attack when *79 potential difficulties can be remedied in future cases through fact-specific as-applied challenges.”); see also Corgain v. Miller, 708 F.2d 1241, 1251 (7th Cir.1983) (upholding facial adequacy of plan for prisoner’s access to law library, but not foreclosing future challenge to plan as implemented).
D. Dormant Commerce Clause
Holding that the Maine Act is not preempted by the Medicaid statute, we next consider whether it violates the dormant Commerce Clause. The Constitution provides that Congress shall have the power “[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]” U.S. Const. art. I, § 8, cl. 3. The constitutional provision affirmatively granting Congress the authority to legislate in the area of interstate commerce “has long been understood, as well, to provide ‘protection from state legislation inimical to the national commerce [even] where Congress has not acted....”’ Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 61 (1st Cir.1999) (alterations in original) (quoting Barclays Bank PLC v. Franchise Tax Bd. of Cal., 512 U.S. 298, 310, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994)), aff'd sub nom. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). This negative command, known as the dormant Commerce Clause, prohibits states from acting in a manner that burdens the flow of interstate commerce. Okla. Tax Comm’n v. Jefferson Lines, Inc., 514 U.S. 175, 179-80, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995); Healy v. Beer Inst., 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).
The restriction imposed on states by the dormant Commerce Clause is not absolute, and “the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected.” Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (internal quotation marks omitted). The prohibitions imposed upon state regulation by the dormant Commerce Clause have fallen into several identifiable categories. To determine whether a statute violates the dormant Commerce Clause, we apply one of several levels of analysis, depending on the effect and reach of the legislation.
First, a state statute is a per se violation of the Commerce Clause when it has an “extraterritorial reach.” Healy, 491 U.S. at 336, 109 S.Ct. 2491. “[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State’s authority and is invalid regardless of whether the statute’s extraterritorial reach was intended by the legislature.” Id. When a state statute regulates commerce wholly outside the state’s borders or when the statute has a practical effect of controlling conduct outside of the state, the statute will be invalid under the dormant Commerce Clause. Cotto Waxo Co. v. Williams, 46 F.3d 790, 793 (8th Cir.1995) (citing Healy). A statute will have an extraterritorial reach if' it “necessarily requires out-of-state commerce to be conducted according to in-state terms.” Id. at 794.
Second, if a state statute discriminates against interstate commerce, we apply strict scrutiny. It will be scrutinized under a “virtually per se invalid rule,” which means that the statute will be invalid unless the state can “show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.” Or. Waste Sys., Inc. v. Dep’t of Envtl. Quality of Or., 511 U.S. 93, 100-01, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (alteration and in *80 ternal quotation marks omitted). This level of scrutiny will be applied if the state statute discriminates against interstate commerce on its face or in practical effect. Taylor, 477 U.S. at 138, 106 S.Ct. 2440; see also Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (indicating that a finding of discriminatory purpose or discriminatory effect can constitute economic protectionism subjecting the state statute to a “stricter level of invalidity”). When a state statute “discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry.” Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).
Third, a lower standard of scrutiny is applied when the state statute regulates evenhandedly and has only incidental effects on interstate commerce. In this situation, a balancing test is applied. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). “Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.” Id.
PhRMA contends that the Maine Act is an impermissible exercise in extraterritorial regulation and, therefore, is per se viola-tive of the dormant Commerce Clause. It argues that the Act necessarily regulates the transaction that occurs between the manufacturer and the distributor outside the borders of Maine.
Maine first argues that we need not reach the issue of whether the Act violates the dormant Commerce Clause because it is acting as a “market participant” and is therefore exempt from Commerce Clause restrictions.[9] See South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 93, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (“if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities”). We hold that Maine does not fall under the market participant exception to the dormant Commerce Clause. Maine is not a market buyer of prescription drugs, except as required by the Medicaid statute. Its citizens will continue to directly purchase prescription drugs as needed. Nothing in the Act makes Maine a market participant.
Maine alternatively argues that the Act evenhandedly regulates in-state conduct that only has an incidental effect on interstate commerce. Maine contends that we should apply the lower level of scrutiny, use the Pike balancing test, and find that the local benefits of the Maine Rx Program outweigh the incidental burden on interstate commerce.
The Maine Act represents a novel legislative approach to one of the serious problems of our time, one that resists easy analysis. We address each of the potentially applicable dormant Commerce Clause prohibitions to determine the appropriate analysis and level of scrutiny.
1. Per Se Invalidity: Extraterritorial Reach
A state may not pass laws that have the “ ‘practical effect’ of regulating commerce occurring wholly outside that State’s borders.... ” Healy, 491 U.S. at 332, 109 S.Ct. 2491. When evaluating the *81 practical effect of the statute, the court should consider the statute itself, and “how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.” Id. at 336, 109 S.Ct. 2491.
PhRMA relies on three cases to support its argument that the Maine Act is per se invalid because it regulates conduct beyond the borders of Maine. The cases cited, however, are inapposite to the facial construction of the Maine Act. PhRMA construes these cases as standing for the proposition that, “a state may not dictate the terms on which buyers and sellers do business outside of the state.” See, e.g., Healy, 491 U.S. at 338, 109 S.Ct. 2491; Brown-Forman, 476 U.S. at 583-84, 106 S.Ct. 2080. This is partially correct but does not reflect the entire picture. The cases on which PhRMA relies, however, involve price control, price affirmation or price tying schemes. See Healy, 491 U.S. at 326, 109 S.Ct. 2491; Brown-Forman, 476 U.S. at 575-76, 106 S.Ct. 2080; Baldwin v. G.A.F. Seelig, 294 U.S. 511, 519, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (“Seelig”). The statutes in these cases involved regulating the prices charged in the home state and those charged in other states in order to benefit the buyers and sellers in the home state, resulting in a direct burden on the buyers and sellers in the other states.
In Healy, the Court struck down a Connecticut Liquor Control Act that required out-of-state shippers of beer to affirm that the prices at which the products were sold to Connecticut wholesalers were no higher than prices at which those same products were sold in bordering states. 491 U.S. at 326, 109 S.Ct. 2491. The Court held the statute to be unconstitutional because it controlled prices in neighboring states and interfered with the regulatory schemes in those states. Id. at 338-39, 109 S.Ct. 2491.
In Brown-Forman, the Court struck down a provision of the New York Alcoholic Beverage Control Law that required liquor distillers to affirm that their prices were no higher than the lowest price at which the same product would be sold in any other state during the month. 476 U.S. at 575-76, 106 S.Ct. 2080. The Court determined that this was an extraterritorial reach violative of the Constitution. It held that “[o]nce a distiller has posted prices in New York, it is not free to change its prices elsewhere in the United States during the relevant month. Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.” Id. at 582, 106 S.Ct. 2080 (footnote omitted).
In Seelig, the Court struck down the New York Milk Control Act, which set minimum prices for milk purchased from in-state and out-of-state producers and banned the resale of milk in New York when that milk had been purchased out-of-state for a lower price. 294 U.S. at 519, 55 S.Ct. 497. By requiring New York wholesalers to buy out-of-state milk at certain prices, the effect of the statute was to essentially set out-of-state milk prices. The Court recognized that the Commerce Clause does not permit a state to create a “scale of prices for use in other states, and to bar the sale of products ... unless the scale has been observed.” Id. at 528, 55 S.Ct. 497.
The Maine Act is different from these statutes. Unlike these price affirmation and price control statutes, the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain *82 price.[10] Similarly, Maine is not tying the price of its in-state products to out-of-state prices. There is nothing within the Act that requires the rebate to be a certain amount dependent on the price of prescription drugs in other states. The Act merely says that the Commissioner of the Maine Department of Human Services shall use “best efforts to obtain an initial rebate amount equal to or greater than the rebate calculated under the Medicaid program .... ” Me.Rev.Stat. Ann. tit. 22, § 2681(4)(B). Furthermore, unlike Bromir-Fonnan and Seelig, the Maine Act does not impose direct controls on a transaction that occurs wholly out-of-state.
PhRMA argues strenuously that the effect of the Act will be to regulate the transaction that occurs between the manufacturer and the wholesaler — a transaction that occurs entirely out of state. It argues that as a result of the rebate provision, manufacturers will lose a portion of their profits otherwise obtained from distributors. Admittedly, it is possible that the rebate provisions of the statute may decrease the profits of manufacturers. Simply because the manufacturers’ profits might be negatively affected by the Maine Act, however, does not necessarily mean that the Maine Act is regulating those profits.
The Act does not regulate the transaction between manufacturers and wholesalers. It provides for a negotiated rebate agreement between “[a] drug manufacturer or labeler that sells prescription drugs in [Maine] through the elderly low-cost drug program ... or any other publicly supported pharmaceutical assistance program.....” Me.Rev.Stat. Ann. tit. 22, § 2681(3). The rebate program is voluntary and either the manufacturer or the State may withdraw at any time with sixty days’ notice. The Act directs the commissioner to “use the commissioner’s best efforts” to negotiate the amount of the rebate required from the manufacturer. Id. § 2681(4)(B). We note that the commissioner’s “best efforts” may become coercive or otherwise inappropriate, but we cannot say so on this facial challenge. This may be an issue that needs to be revisited once the Act takes effect. On a facial challenge, however, the use of the commissioner’s “best efforts” indicates that the Act is not “regulating” prices, but merely “negotiating” rebates.
The Act clearly does not interfere with regulatory schemes in other states. Ultimately, the Maine Act simply regulates activity that occurs in state: (1) the purchase of the prescription drugs that triggers the rebate; (2) the negotiation of a rebate amount; and (3) the State’s action subjecting a manufacturer’s drug to prior authorization and releasing the manufacturer’s name to health care providers and the public occurs in state. Because the regulation only applies to in-state activities, there is no extraterritorial reach and the Act is not per se invalid under the Commerce Clause.
One final consideration is the consequence of other states passing similar statutes. See Healy, 491 U.S. at 336, 109 S.Ct. 2491 (considering “what effect would arise if not one, but many or every, State adopted similar legislation”). The most apparent effect of similar statutes being passed in other states would be a loss in profits for manufacturers. It does not appear, and PhRMA does not argue, that statutes similar to the Maine Act, if enacted, would result in manufacturers having *83 inconsistent obligations to states, or in creating a “price gridlock” linking prices in some states to the prices in other states. See Healy, 491 U.S. at 340, 109 S.Ct. 2491. Therefore, at this time, when we are dealing with a facial challenge to the Act, there is no evidence that adverse effects on interstate commerce will occur if such legislation were passed in other states. The Act is not per se violative of the Commerce Clause.
2. Strict Level of Scrutiny: Discriminatory Statute
A statute enacted for a discriminatory purpose is subject to strict scrutiny. See Bacchus Imports, Ltd., 468 U.S. at 270, 104 S.Ct. 3049. Underthis strict scrutiny analysis, a statute violates the Commerce Clause unless the state can show that the statute serves a legitimate local purpose that is unrelated to economic protectionism and that the same purpose could not be achieved by nondiscriminatory means. Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). PhRMA does not contend, nor did the district court find, that the Maine Act discriminates on its face or in its effects. Therefore, we need not discuss it further.
3. Low Level of Scrutiny: Pike Balancing Test
When a state statute regulates evenhandedly and has only incidental effects on interstate commerce, that statute will be upheld unless the burden on interstate commerce is “clearly excessive in relation to the putative local benefits.” Pike, 397 U.S. at 142, 90 S.Ct. 844.
Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, but more frequently it has spoken in terms of “direct” and “indirect” effects and burdens.
Id. (internal citations omitted). The Maine Act is neither an impermissible extraterritorial reach nor is it discriminatory; rather, it regulates evenhandedly and only has incidental effects on interstate commerce. Therefore, we apply this lower level of scrutiny, known as the Pike balancing test.
The district court found the Maine Act to be per se invalid, and therefore never determined whether it survives the Pike balancing test. Though the district court did not undertake such an analysis, we may conduct the Pike balancing test for the first time on appeal. See Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d 813, 826 (3d Cir.1994). In Instructional Systems, the Third Circuit considered a facial challenge to the New Jersey Franchise Practices Act after the district court had declared the statute per se invalid under the dormant Commerce Clause. Id. at 826. The court found that the statute, from a facial standpoint, survived the Pike test, and reversed the district court judgment which had declared the statute unconstitutional. Id. at 827. The Third Circuit recognized, however, that the issue of whether the statute, when applied, burdens interstate commerce could not be resolved as a matter of law. Id.
Applying the Pike balancing test to the Maine Act, we consider: (1) the *84 nature of the putative local benefits advanced by the statute; (2) the burden the statute places on interstate commerce; and (3) whether the burden is “clearly excessive” as compared to the putative local benefits. See Pike, 397 U.S. at 142, 90 S.Ct. 844.
Arguably, the only burden imposed on interstate commerce by the Maine Act is its possible effects on the profits of the individual manufacturers. As the Third Circuit stated, however, “the fact that a law may have ‘devastating economic consequences’ on a particular interstate firm is not sufficient to rise to a Commerce Clause burden.” Instructional Sys., 35 F.3d at 827 (quoting Ford Motor Co. v. Ins. Comm’r, 874 F.2d 926, 943 (3d Cir.1989)); see also Exxon Corp. v. Governor of Md., 437 U.S. 117, 127-28, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (stating that “the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.”).
We next consider the local benefits of the Act, which we find to be substantial. The Maine Rx ’Program will potentially provide prescription drugs to Maine citizens who could not otherwise afford them. The Maine Legislature has decided that without the Maine Rx Program, needy Maine citizens will continue to be deprived of necessary medical care because of rising prescription drug costs. When measuring manufacturers’ possible loss of profits against the increased access to prescription drugs for Maine citizens, the local benefits appear to outweigh the burden on interstate commerce. At the very least, the burden on interstate commerce is not “clearly excessive” as compared to the local benefits.
It is necessary to recognize the difficulty in foreseeing what events actually will occur from the enforcement of this Act, which admittedly makes the Pike balancing test more challenging to apply. We are forced to balance the possible effects, instead of the actual effects of the statute in action. For now, it is enough to say that the Act survives the facial challenge under the dormant Commerce Clause.[11]
E. Remaining Preliminary Injunction Factors
Having concluded that PhRMA is not likely to succeed on the merits of its constitutional challenges, we need not delve into the three remaining preliminary injunction factors (risk of irreparable harm, the balance of equities and the public interest). This court has recognized that the “sine qua non” of the preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of the *85 claim. Weaver v. Henderson, 984 F.2d 11, 12, 14 n. 5 (1st Cir.1993) (concluding that, after determining that there was no likelihood of success on the merits, it was not necessary to examine the other factors). We must conclude that PhRMA has not satisfied its burden to obtain a preliminary-injunction preventing the implementation of the Act.
III. CONCLUSION
In this facial challenge, we perceive no conflict between the Maine Act and the Medicaid statute that would result in federal preemption. The Act sets forth prior authorization procedures that are consistent with those explicitly permitted by Medicaid. PhRMA has not established at this point that the administrative burden imposed by prior authorization will likely harm Medicaid recipients. In the absence of such evidence, we cannot conclude that the Act violates the Supremacy Clause.
Nor does the Act offend the dormant Commerce Clause. It is not an extraterritorial regulation on interstate commerce because it does not regulate conduct occurring outside the state, but only regulates in-state activities. Moreover, from a facial standpoint, the local benefits of the Act appear to outweigh any incidental burden on interstate commerce. For the reasons stated, the Maine Act survives the facial dormant Commerce Clause challenge.
This is a close case but we do not think that, under the applicable law, the State of Maine should be prohibited from putting the Act into play. We heed the dissent of Justice Louis Brandéis in New State Ice Co. v. Liebmann, 285 U.S. 262, 310, 52 S.Ct. 371, 76 L.Ed. 747 (1932):
To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious, or unreasonable. We have power to do this, because the due process clause has been held by the Court applicable to matters of substantive law as well as to matters of procedure. But, in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.
(footnote omitted).
The decision of the district court is REVERSED and the temporary injunction is VACATED.
APPENDIX
The relevant provisions of the Act are as follows:
The Maine Rx Program, referred to in this subchapter as the “program,” is established to reduce prescription drug prices for residents of the State. The program is designed for the State to utilize manufacturer rebates and pharmacy discounts to reduce prescription drug prices. In implementing the program, the State shall serve as a pharmacy benefit manager in establishing rebates and discounts on behalf of qualified residents.
1. Program goals. The Legislature finds that affordability is critical in providing access to prescription drugs for Maine residents. This subchapter is enacted by the Legislature to enable the *86 State to act as a pharmacy benefit manager in order to make prescription drugs more affordable for qualified Maine residents, thereby increasing the overall health of Maine residents, promoting healthy communities and protecting the public health and welfare. It is not the intention of the State to discourage employers from offering or paying for prescription drug benefits for their employees or to replace employer-sponsored prescription drug benefit plans that provide benefits comparable to those made available to qualified Maine residents under this subchapter.
* * * *
3. Rebate agreement. A drug manufacturer or labeler that sells prescription drugs in this State through the elderly low-cost drug program under section 254 or any other publicly supported pharmaceutical assistance program shall enter into a rebate agreement with the department for this program. The rebate agreement must require the manufacturer or labeler to make rebate payments to the State each calendar quarter or according to a schedule established by the department.
4. Rebate amount. The commissioner shall negotiate the amount of the rebate required from a manufacturer or labeler in accordance with this subsection.
A. The commissioner shall take into consideration the rebate calculated under the Medicaid Rebate Program pursuant to 42 United States Code, Section 1396r-8, the average wholesale price of prescription drugs and any other information on prescription drug prices and price discounts.
B. The commissioner shall use the commissioner’s best efforts to obtain an initial rebate amount equal to or greater than the rebate calculated under the Medicaid program pursuant to 42 United States Code, Section 1396r-8.

. The full text of the relevant provisions of the Act is set forth in the Appendix, infra.

. The Act also contained a provision that made it “illegal profiteering” for a manufacturer to "exact[] or demand[] an unconscionable price” or to ”exact[] or demand[] prices or terms that lead to any unjust or unreasonable profit.” An Act to Establish Fairer Pricing for Prescription Drugs, § 2697(2), 2000 Me. Legis. Ch. 786 (S.P. 1026) (L.D.2599) (to be codified at Me.Rev. Stat. Ann. tit. 22, § 2697(2)). The district court found this provision unconstitutional. The State of Maine has not appealed this ruling.

. There is some dispute among the circuits as to whether prudential standing (as opposed to Article III standing) can be raised for the first time on appeal. Compare Animal Legal Def. Fund v. Espy, 23 F.3d 496, 499 (D.C.Cir.1994) (prudential standing is non-waivable); Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir.1994) (same); Cmty. First Bank v. Nat’l Credit Union Admin., 41 F.3d 1050, 1053 (6th Cir.1994) (same) with Pershing Park Villas Homeowners Assn v. United Pac. Ins. Co., 219 F.3d 895, 899 (9th Cir.2000) (prudential standing is waivable); Lindley v. Sullivan, 889 F.2d 124, 129 (7th Cir.1989) (same). Because we hold that Maine's challenge to PhRMA’s standing would be unsuccessful in any event, as explained infra, it is not necessary for us to decide the waiver issue now.

. Only the prior authorization review requirement of the Act, is at issue for preemption purposes, not the public identification requirement. Therefore, for simplicity's sake, our use of the terms "the Act” or "Maine Rx Program” refer solely to the prior authorization review requirement.

. An amicus curiae brief offers another basis for federal preemption: Edwin D. Schindler, Major Stockholder and Patent Attorney, argues that the Maine Act is preempted by federal patent law. Because these issues were raised for the first time on appeal by an amicus, not by a party, we do not consider them. Am. Fed'n of Gov’t Employees, Local 3936 v. Fed. Labor Relations Auth., 239 F.3d 66, 69 (1st Cir.2001); United States v. Sturm, Ruger & Co., 84 F.3d 1, 6 (1st Cir.1996) ("an amicus cannot introduce a new argument into a case”).

.Express preemption of a state law occurs where “a federal statute explicitly confirms Congress’s intention to preempt state law and defines the extent of that preclusion.” Grant’s Dairy-Me., LLC v. Comm’r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 15 (1st Cir.2000). There is no explicit language in the Medicaid statute that forbids the Maine Rx Program. Nor is the doctrine of "field” preemption relevant, as Medicaid is a cooperative federal and state program. This form of implied preemption applies only when a federal regulatory scheme is so pervasive as to create the inference that Congress did not intend for the states to pass supplemental law in that area. Gade v. Nat’l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Therefore, we consider only implied conflict preemption as a basis for PhRMA's argument.

. Kevin Concannon, Commissioner of the Maine Department of Human Services, affirms in an affidavit that the Department will not impose prior authorization that would conflict with the Medicaid requirements.

. Moreover, the Amicus Curiae Brief of Viola Quirion, Michelle Campbell, Maine Council of Senior Citizens and Richard Donahue, M.D. attaches an affidavit from Maine resident Viola Quirion indicating that because many older persons cannot afford the high costs of prescription drugs, there may be increased enrollment in nursing homes and an increased burden on Medicaid.

.. See Judge Lynch's opinion in Nat'l Foreign Trade Council, 181 F.3d at 62-65, for a thorough scholarly discussion of a state as a market participant.

. As noted above, supra fn. 2, the anti-profiteering provision of the Act was held unconstitutional and is not part of this appeal.

. On appeal, Maine argues in the alternative that the Act does not violate the dormant Commerce Clause because if the rebate provision of the Act is construed as a tax, it satisfies the requirements set forth in the Complete Auto line of cases dealing with taxation on interstate commerce. See Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) (holding that a state’s tax on interstate commerce will be upheld only if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.”). PhRMA replies, arguing that the Complete Auto test is not satisfied. We need not address this argument on the merits, however, because this legal theory was not raised before the district court. " 'If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.' ” Boateng v. Interamerican Univ., Inc., 210 F.3d 56, 62 (1st Cir.2000) (quoting Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir.1992)). This is not one of those extraordinary circumstances.