# United States Court of Appeals
## For the First Circuit

No. 06-2224

WINE AND SPIRITS RETAILERS, INC., ET AL.,

Plaintiffs, Appellants,

v.

STATE OF RHODE ISLAND ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Lynch, Circuit Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Evan T. Lawson, with whom Robert J. Roughsedge, Michael Williams, and Lawson & Weitzen, LLP were on brief, for appellants.
Rebecca Tedford Partington, Deputy Chief, Civil Division, Department of Attorney General, with whom Patrick C. Lynch, Attorney General, was on brief, for state appellees.
Joseph S. Larisa, Jr. and Larisa Law and Consulting, LLC on brief for intervenor-appellee.

March 20, 2007

**SELYA**, **Senior Circuit Judge**.  This appeal requires us to revisit the scene of an earlier battle.  In Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36 (1st Cir. 2005), we affirmed the district court's denial of preliminary injunctive relief against the enforcement of two amendments to Rhode Island's statutory scheme governing in-state liquor sales at retail.  See R.I. Gen. Laws §§ 3-5-11, 3-5-11.1.  Following further proceedings on remand, including a full-dress bench trial, the district court, ruling ore sponte, decided the case in favor of the defendants.  The plaintiffs again appeal.  Discerning no error, we affirm the judgment below.

## I.  BACKGROUND

Typically, we review factual determinations made during a bench trial for clear error and afford plenary review to the trier's formulation and application of the law.  See Smith v. F. W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996); see also Fed. R. Civ. P. 52(a).  The existence of our earlier decision does not alter this basic standard of review.  In considering a prior appeal from the grant or denial of preliminary injunctive relief, our merits-oriented conclusions "are to be understood as statements as to probable outcomes."  Cohen v. Brown Univ., 101 F.3d 155, 169 (1st Cir. 1996).

This does not mean that, in such a situation, we must necessarily reinvent each and every wheel.  To the extent that the

record compiled at the preliminary injunction stage was "sufficiently developed and the facts necessary to shape the proper legal matrix were sufficiently clear, and [if] nothing in the record subsequently developed at trial constitutes substantially different evidence that might undermine the validity of the prior panel's rulings of law," those rulings may be deemed the law of the case. Id. (citation and internal quotation marks omitted). It is against this backdrop that we turn to the record below.

For efficiency's sake, we assume the reader's familiarity with our earlier opinion. That said, we briefly recount the identity of the parties. Plaintiff-appellant Wine & Spirits Retailers, Inc. (W&S) is a Rhode Island corporation engaged in the interstate business of franchising package stores. Plaintiff-appellant John Haronian, a Rhode Island resident, is W&S's principal. Following our earlier decision, these two plaintiffs amended their complaint and enlisted three new plaintiffs, all Rhode Island-based package stores (the Retail Stores) that had entered into franchise agreements with W&S. The Retail Stores are all appellants here. Each of them possesses a Class A license to sell liquor at retail. Furthermore, each of them has operated, and desires to operate in the future, under the trade name "Douglas Wine & Spirits."

The principal defendants (appellees before us) are the State of Rhode Island and Jeffrey J. Greer, in his official

-3-

capacity as the associate director of the Rhode Island Department of Business Regulation. We henceforth shall refer to these defendants, collectively, as "the State." In addition, a trade association, the United Independent Liquor Retailers of Rhode Island, has intervened as a defendant.

In our previous decision, we described in detail the relevant aspects of the statutory amendments challenged by the plaintiffs. See Wine & Spirits, 418 F.3d at 42-43. Briefly stated, those amendments, enacted in 2004, prohibit franchisees from holding Class A liquor licenses and nullify existing franchise agreements that conflict with that proscription. See R.I. Gen. Laws § 3-5-11.1. Rhode Island had barred chain-store organizations from holding Class A liquor licenses since 1933, and the Rhode Island General Assembly accomplished the broader prohibition, in part, by expanding the chain-store definition to encompass franchise-type arrangements. See id. § 3-5-11(b).

There is another facet to this case (not mentioned in the earlier appeal). That facet involves the plaintiffs' challenge to a related statutory provision, not part of the 2004 amendment cycle, that imposes an in-state residency requirement for prospective liquor licensees. See id. § 3-5-10.

In the court below, the plaintiffs attacked the statutory scheme on several fronts. As stated, the district court nonetheless denied preliminary injunctive relief. See Wine &

-4-

<u>Spirits</u>, 418 F.3d at 42. Later, the court conducted a bench trial and — for reasons described later in this opinion — repulsed each and all of the plaintiffs' initiatives.

This timely appeal followed. For ease in analysis, we divide the plaintiffs' assignments of error into three groups.

## II. THE FIRST AMENDMENT CLAIMS

The First Amendment applies to the several states by operation of the Fourteenth Amendment. <u>See</u> <u>44 Liquormart, Inc.</u> v. <u>Rhode Island</u>, 517 U.S. 484, 489 n.1 (1996). Here, the plaintiffs press two First Amendment claims, each of which charges abridgment of speech. No arguments pertaining to freedom of association have been briefed, and any such arguments are, therefore, waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

In essence, the plaintiffs assert that (i) the prohibition against participation in joint advertisements, R.I. Gen. Laws § 3-5-11(b)(1)(iii),[1] and (ii) the prohibition against the use of a trade name associated with a chain-store organization, <u>see</u> <u>id.</u> § 3-5-11(b)(1)(vi), violate the First Amendment. In our earlier decision, we acknowledged that "commercial speech, including truthful liquor advertising, is entitled to a measure of

_____

[1]The plaintiffs to some extent also challenge the restrictions on coordinated marketing, <u>see</u> R.I. Gen. Laws § 3-5-11(b)(1)(iv), and the restrictions on agreed pricing, <u>see</u> <u>id.</u> § 3-5-11(b)(1)(v). Because these provisions are similar in character to the joint advertising ban and because the plaintiffs lavish most of their attention on the latter, we use section 3-5-11(b)(1)(iii) as an exemplar.

protection under the First Amendment." Wine & Spirits, 418 F.3d at 48. As to W&S and Haronian, however, we determined that the "provision of advertising and [trade name] licensing services is not speech that proposes a commercial transaction and therefore does not constitute commercial speech." Id. at 49 (citing Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 482 (1989)). By the same token, the provision of such services is not protected as symbolic speech. Id. (citing United States v. O'Brien, 391 U.S. 367, 376-77 (1968)). Since the plaintiffs have advanced no new arguments on this front, there is no reason to revisit those conclusions.

That does not end this aspect of the matter because, in our earlier decision, we left open the question of whether the restrictions on joint advertising and shared trade names might infringe the First Amendment rights of a franchisee holding a Class A liquor license — a claim that neither W&S nor Haronian had standing to pursue. See id. at 48-50. Given the emergence of the Retail Stores as parties plaintiff — they appear to have been joined for precisely this purpose — we must now examine the merits of these contentions.

### A. **Joint Advertising**.

With respect to joint advertising, the Retail Stores contend that section 3-5-11(b)(1)(iii) does not prohibit agreements about prices and products but, rather, prohibits the advertisements

themselves. Building on this foundation, they suggest that, at its core, the prohibition "bans speech as a means of addressing underlying conduct." Appellants' Br. at 44. To support this extravagant claim, the Retail Stores point to evidence adduced at trial regarding joint advertisements that make no reference to agreed-upon prices or common products.

This argument lacks force. Section 3-5-11(b)(1)(iii) forbids a licensee's "[p]articipation in a coordinated or common advertisement." This prohibition does not target speech; each individual liquor licensee remains at liberty to disseminate information about its prices and products to other retail stores and to the public at large. See Wine & Spirits, 418 F.3d at 47 (making a similar point with respect to W&S's provision of business advice). Seen in that light, the statute is at a far remove from the legislation at issue in 44 Liquormart, which completely banned the advertising of prices. See 517 U.S. at 516. The statute at issue here merely proscribes conduct — the launching of advertisements resulting from pre-agreed commercial strategies. Such a ban is not a ban on commercial speech. See Wine & Spirits, 418 F.3d at 49. The fact that it is possible to design advertisements violative of the ban that do not mention specific prices or products does not prove that the statute is concerned with speech as opposed to conduct.

We add, moreover, that even if the joint advertising prohibition could be said to touch upon commercial speech under other circumstances, it would not implicate any protected interest possessed by the Retail Stores. Acting in concert to implement an advertising plan no more proposes a commercial transaction than does the provision of advertising services by W&S — a practice that we have found not protected under the First Amendment. See id. And, finally, the conduct in question is not so inherently expressive as to warrant First Amendment protection under the O'Brien doctrine. See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 126 S. Ct. 1297, 1310 (2006) (FAIR); see also O'Brien, 391 U.S. at 376-77. In these circumstances, any restriction of speech would be purely incidental to the regulation of conduct. And as the Supreme Court recently reminded us:

> [I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

FAIR, 126 S. Ct. at 1308 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)).

Taking a somewhat different tack, the plaintiffs suggest that the Rhode Island statute is flawed because other commercial entities are not forbidden from advertising jointly. That suggestion attempts to invoke the precept that, even in the commercial milieu, "decisions that select among speakers conveying

-8-

virtually identical messages are in serious tension with the principles undergirding the First Amendment." <u>Greater New Orleans Broad. Ass'n</u> v. <u>United States</u>, 527 U.S. 173, 193-94 (1999).  The precept, though sound, is inapposite here.

The Supreme Court has emphasized the importance of context in evaluating claims that legislation abridges First Amendment rights.  <u>See</u> <u>Edenfield</u> v. <u>Fane</u>, 507 U.S. 761, 774 (1993); <u>see</u> <u>also</u> <u>Glickman</u> v. <u>Wileman Bros. & Elliott, Inc.</u>, 521 U.S. 457, 469 (1997).  In line with that emphasis, the precept upon which the Retail Stores rely cannot be construed to divest the states of their ability to devise specific rules for businesses in different fields, that is, for businesses that are not similarly situated. <u>See</u>, <u>e.g.</u>, <u>Edenfield</u>, 507 U.S. at 774 (stressing the importance, in evaluating the constitutionality of commercial speech regulations, of distinctions between different professions); <u>cf.</u> <u>37712, Inc.</u> v. <u>Ohio Dep't of Liquor Control</u>, 113 F.3d 614, 620-23 (6th Cir. 1997) (rejecting due process and equal protection challenges because holders of different licenses were not similarly situated).  This is merely a reflection of the time-honored tenet that, within wide limits, courts must defer to state legislative classifications constructed to further legitimate economic objectives.  <u>See</u> <u>37712, Inc.</u>, 113 F.3d at 622.

So it is here.  A trial court's findings of fact, made in connection with one legal theory, may often be treated as fungible

-9-

in connection with another. See, e.q., Societe Des Produits Nestle v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir. 1992). That principle applies in this case; although the lower court addressed the "classification" argument in equal protection terms, its findings of fact are readily transferable to the precincts patrolled by the First Amendment.

The district court found as a matter of fact that the Retail Stores had failed to demonstrate that they and those other entities to which they alluded were similarly situated. This finding is not clearly erroneous (indeed, it appears to be unassailable). Consequently, we reject the plaintiffs' disparate treatment claim.

### B. <u>Shared Trade Names</u>.

The remaining prong of the plaintiffs' First Amendment challenge involves the statutory restriction on the use of shared trade names. See R.I. Gen. Laws § 3-5-11(b)(1)(vi) (prohibiting Class A licensees from using "[a]ny term or name identified as a chain or common entity"). The Retail Stores assert a constitutional right to do business under the Douglas name, which they believe "conveys a positive message to potential consumers." Appellants' Br. at 42.

It cannot be gainsaid that the use of a trade name implicates the user's commercial speech rights. See Friedman v. Rogers, 440 U.S. 1, 11 (1979). This brings front and center the

familiar four-part test for whether a regulation of commercial speech is constitutionally permissible. See, e.g., Thompson v. W. States Med. Ctr., 535 U.S. 357, 367 (2002) (citing Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566 (1980)); El Día, Inc. v. P.R. Dep't of Consumer Affairs, 413 F.3d 110, 113 & n.5 (1st Cir. 2005).

It is not always necessary, however, to deal with each of the test's four parts. In framing the inquiry, the threshold question is whether "the commercial speech concerns unlawful activity or is misleading." W. States Med. Ctr., 535 U.S. at 367. If so, the inquiry ends there: "the speech is not protected by the First Amendment." Id.; see Fla. Bar v. Went For It, Inc., 515 U.S. 618, 623-24 (1995); Edenfield, 507 U.S. at 768. The Retail Stores are unable to cross this threshold.

In a case that antedated Central Hudson, the Supreme Court held that the First Amendment posed no obstacle to state regulation of trade names when "a significant possibility" existed that such names would "be used to mislead the public." Friedman, 440 U.S. at 13, 15. In that instance, the plaintiffs challenged a total ban on the use of trade names in the practice of optometry. While mulling the challenge, the Court took stock of the myriad possibilities for deception and concluded that the ban related to "conduct the State rationally may wish to discourage." Id. at 13. With that framework in place, the Court upheld the restriction,

explaining that it had only an incidental effect on the commercial speech rights of optometrists (who remained free to advertise their prices, products, and services under their own names). Id. at 15-16.

Since its decision in Friedman, the Court has made a doctrinal refinement, distinguishing in the professional services context between commercial speech that is inherently or actually misleading and commercial speech that is only potentially misleading. See, e.g., Ibanez v. Fla. Dep't of Bus. & Prof'l Reg., Bd. of Accountancy, 512 U.S. 136, 144-46 (1994); In re R. M. J., 455 U.S. 191, 203 (1982); see also Am. Acad. of Pain Mgmt. v. Joseph, 353 F.3d 1099, 1106-07 (9th Cir. 2004). Under the doctrine as refined, advertising that is actually misleading "may be prohibited entirely." In re R. M. J., 455 U.S. at 203. Contrastingly, a state "may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive." Id. We need not (and do not) decide the issue, but we note that recent decisions have applied this dichotomy beyond the professional services context. See, e.g., Pearson v. Shalala, 164 F.3d 650, 655 (D.C. Cir. 1999).

In the case at hand, the plaintiffs argue that the State has not shown that the use of a shared trade name by independent package stores is misleading and that, in all events, there is no

-12-

evidence of consumer confusion.  While certain elements of this argument are irreproachable — a governmental entity attempting to enforce a restriction on commercial speech has the burden of justifying the restriction, W. States Med. Ctr., 535 U.S. at 373, and courts will not sustain restrictions resting either on a dearth of evidence of deception or on unsupported assertions, see Ibanez, 512 U.S. at 145, 148-49; El Día, 413 F.3d at 116 — the argument as a whole does not survive scrutiny.

Even assuming, for argument's sake, that the Ibanez dichotomy applies here, the State's concern about the misleading nature of chain-associated trade names, when used by independent package stores, is readily supportable.  The district court, in its preliminary injunction ruling, refused to enjoin the enforcement of the "no franchise" provisions contained in the statutory scheme but temporarily blocked the enforcement of the prohibition against the use of a shared trade name.  See Wine & Spirits, 418 F.3d at 44. In conformity with those rulings, the Retail Stores relinquished their franchise agreements and claimed, from that point forward, to be acting as independent businesses.  They nonetheless continued to use the Douglas name.  Although we subsequently allowed the injunction against enforcement of the "trade name" restriction to lapse, see id., the Retail Stores apparently persisted in using a shared trade name.

At trial, the district court, as the finder of the facts, examined the Retail Stores' actual use of the shared trade name during the period when they professed to be operating independently. It determined that each of the former franchisees had simply appended the name of the municipality in which its shop was located to the Douglas name. The court received evidence that newspaper advertisements purportedly placed by individual stores on a rotating basis featured the Douglas name in large letters and bold font, while reporting the store's location information in much smaller print that was "far less likely to be noticed by the reader"; that participating stores prominently displayed exact replicas of these advertisements and offered for sale the same products (both advertised and non-advertised) for the same prices; and that the Retail Stores continued to receive suggested store layouts and employee dress codes from W&S. Citing this evidence, the court found as a fact that the Retail Stores' shared use of the Douglas name "conveys and, obviously, is intended to convey to consumers the impression that all of the stores are part of a single entity and operate in concert." Given the Retail Stores' assurances that they had been operating independently from and after the effective date of the 2004 amendments, the court concluded that the impression conveyed by the use of the shared trade name was "untrue and, therefore, misleading."

These findings are not clearly erroneous (indeed, the plaintiffs do not contest them). They graphically illustrate why the use of a shared trade name in the retail liquor market by supposedly independent package stores poses an area of legitimate concern for a state that has abolished franchise and chain-store arrangements in that market. The findings, therefore, comprise a showing sufficient to underpin the restriction enacted by the Rhode Island General Assembly.

The Retail Stores counter that the State should, at most, be able to require the placement of qualifying language (say, "independently owned and operated") in connection with independent retailers' use of a shared trade name. That is whistling past the graveyard: as a general matter, the law imposes no requirement that a regulation of commercial speech constitute the least restrictive means of accomplishing the State's legitimate goal. See Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 556 (2001); Passions Video, Inc. v. Nixon, 458 F.3d 837, 843 (8th Cir. 2006). At any rate, the record here contains nothing that would compel — or even support — a conclusion that such a disclaimer would be an effective means of avoiding deception.

That ends this chapter of the tale. As the district court supportably found, the Retail Stores' actual usage of the shared trade name tends, in a misleading fashion, to identify the users as part of a chain or entity under common control. For that

reason, the restriction imposed by the State is constitutionally permissible.[2]

## III.  THE COMMERCE CLAUSE CLAIMS

The Constitution grants to Congress the power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  Within this grant of power, what has come to be known as the dormant commerce clause prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors."  Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 18 (1st Cir. 2000).  State regulation of the sale of alcoholic beverages is, however, unique; while such regulation is subject to the nondiscrimination principles of the dormant commerce clause, the Twenty-first Amendment confers upon the several states wide-ranging control over the structure of local liquor distribution systems.  See Granholm v. Heald, 544 U.S. 460, 487-89 (2005).

---

[2]None of the three appellate decisions bruited by the Retail Stores casts doubt upon this conclusion.  In two of them, the restricted speech was neither misleading nor related to unlawful activity.  See Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth., 134 F.3d 87, 98 (2d Cir. 1998); Sambo's Rests., Inc. v. City of Ann Arbor, 663 F.2d 686, 694 (6th Cir. 1981).  In the third, the Fifth Circuit, adjudicating an "as applied" challenge, found the use of the trade names at issue to be not misleading in view of the plaintiff's sophisticated consumer base and distinctive labeling method.  See Piazza's Seafood World, LLC v. Odom, 448 F.3d 744, 753 (5th Cir. 2006).  This decision has little bearing on the issues before us.

Notwithstanding this constitutionally sanctioned zone of control, the plaintiffs charge that Rhode Island's liquor distribution regime violates the dormant commerce clause. This charge, which was not addressed in our earlier decision, has two facets — one narrowly focused and the other more global. In a rifle-shot attack, the plaintiffs allege that, by limiting Class A licenses to Rhode Island residents, R.I. Gen. Laws § 3-5-10 discriminates on its face against out-of-state residents. In a broader fusillade, they allege variously that the statutory scheme discriminates in both purpose and effect, legislates extraterritorially, and unduly burdens the free flow of interstate commerce.

A statute that discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny. See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005). Under this rigorous form of review, a statute is invalid unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means. See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99-101 (1994). Relatedly, the Supreme Court has explained that legislation purporting to regulate commerce that occurs wholly beyond a state's borders "is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." Healy v. Beer Inst., 491 U.S. 324, 336 (1989); see Pharm. Research

& Mfrs. of Am. v. Concannon, 249 F.3d 66, 79 (1st Cir. 2001), aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644 (2003).

A statute that "regulates evenhandedly and has only incidental effects on interstate commerce engenders a lower level of scrutiny." Alliance of Auto. Mfrs., 430 F.3d at 35 (citation and internal quotation marks omitted). In those circumstances, courts employ the balancing test limned in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). That test is straightforward: assuming that the statute operates evenhandedly to achieve a legitimate local interest and that its effects on interstate commerce are incidental, it will stand "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." Id. at 142.

With these jurisprudential building blocks in place, we turn to the concerns identified by the plaintiffs.

## A. Residency Requirements.

The plaintiffs' first line of attack is directed at section 3-5-10. A liquor-license residency requirement has been in force in Rhode Island since 1933 (albeit with modifications over time). With exceptions not relevant here, the current version of the Rhode Island law provides that Class A package store licenses are to be issued "only to . . . residents of this state." R.I. Gen. Laws § 3-5-10(a)(1). Relatedly, no such license "shall be

issued to [a] corporation unless each officer, director or stockholder is a suitable person to hold a license."  Id. § 3-5-10(b)(1).[3]

These requirements, the plaintiffs contend, violate the dormant commerce clause because they discriminate on their face against out-of-state residents.  The district court did not reach the merits of this contention.  Rather, the court ruled that the plaintiffs lacked standing to contest the residency requirements. It based this ruling on its findings (i) that the Retail Stores were Rhode Island entities, each of which already possessed a Class A license; (ii) that W&S, a Rhode Island corporation, had never expressed an interest in obtaining a license; and (iii) that Haronian, also a Rhode Islander, had displayed a similar indifference to acquiring a Class A license.  Given these facts, the plaintiffs had failed to demonstrate any injury in fact stemming from section 3-5-10's residency requirements.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (describing

---

[3]In a different provision, the statute states that "[r]etailer's licenses may, however, be issued to corporations incorporated in any other of the United States which are authorized by the secretary of state to transact business in this state." R.I. Gen. Laws § 3-5-10(a)(1).  Despite this provision, the parties have stipulated that "all Class A licenses must be held by Rhode Island residents or Rhode Island corporations."  Given the plaintiffs' lack of standing, see text infra, we need not resolve the seeming contradiction between the quoted provision and the parties' stipulation.

the requirements for Article III standing); <u>Pagán</u> v. <u>Calderón</u>, 448 F.3d 16, 26-27 (1st Cir. 2006) (similar).

On appeal, the plaintiffs do not challenge the district court's findings of fact. They do, however, argue that as a legal matter the district court took too crabbed a view of standing. They urge us to apply the doctrine that, under the dormant commerce clause, "cognizable injury is not restricted to those members of the affected class against whom states . . . ultimately discriminate." <u>Houlton Citizens' Coal.</u> v. <u>Town of Houlton</u>, 175 F.3d 178, 183 (1st Cir. 1999) (citing <u>Gen. Motors Corp.</u> v. <u>Tracy</u>, 519 U.S. 278, 286 (1997)). The plaintiffs insist that this doctrine enables them to challenge a law that violates the dormant commerce clause even though the law's harmful effects on them are only indirect.

We have no quarrel with the abstract statements of law set forth in <u>Houlton</u>. But context is all-important, and those statements are of no help to the plaintiffs in the circumstances of this case. Here, significantly, the plaintiffs have failed to show <u>any</u> cognizable harm, direct or indirect, attributable to the residency requirements of section 3-5-10. We explain briefly.

The injuries of which the plaintiffs complain arise in consequence of Rhode Island's ban on franchise and chain-store arrangements, not in consequence of the residency requirements per se. After all, the plaintiffs are all Rhode Island residents and,

if favoritism exists, none of them could conceivably have suffered any cognizable harm as a result of it. This deficiency distinguishes the plaintiffs' case from cases like <u>Houlton</u> in which claimants have succeeded in making out the rudiments of standing. <u>See</u>, <u>e.g.</u>, <u>Gen. Motors</u>, 519 U.S. at 286-87; <u>Bacchus Imports, Ltd. v. Dias</u>, 468 U.S. 263, 267 (1984); <u>Alliance of Auto. Mfrs.</u>, 430 F.3d at 37; <u>Houlton Citizens' Coal.</u>, 175 F.3d at 183. Consequently, we uphold the district court's determination that the plaintiffs lack standing to challenge the residency requirements for Class A liquor licensees.

## B. <u>Overall Statutory Scheme</u>.

Taking aim at R.I. Gen. Laws §§ 3-5-11 and 3-5-11.1, the plaintiffs mount a ferocious attack on the State's prohibition against franchise and chain-store arrangements in the retail liquor industry. Their argument runs along the following lines. In determining whether an entity is a chain-store organization (and, thus, forbidden from obtaining a Class A liquor license), the statutory scheme continues to count "chains in which one or more stores are located outside of the state." <u>See</u> <u>id.</u> § 3-5-11(a). That aspect of the statute, when combined with the 2004 ban on franchise-type arrangements, creates (or so the plaintiffs tell us) a regime designed to achieve economic protectionism by advantaging independently owned Rhode Island liquor stores. So viewed, the plaintiffs continue, the statutory scheme discriminates in both

-21-

purpose and effect, legislates extra-territorially, and unduly burdens the free flow of interstate commerce.

The State takes a diametrically opposite position. It asserts that the statutory scheme applies uniformly across the board, barring chain-store organizations and franchise entities, regardless of whether they are based in Rhode Island, from owning package stores. It adds that the evidence adduced at trial revealed no burden on interstate commerce, let alone a discriminatory effect.

We begin with purpose. Parties challenging the validity of a state statute on "purpose" grounds must show that the statute was prompted by a discriminatory purpose. See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979); Alliance of Auto. Mfrs., 430 F.3d at 37. Here, the plaintiffs maintain that their effort finds sustenance in two places in the record. First, they identify what they term an admission by the State that the 2004 amendments were not enacted to promote temperance. Second, they point to two actions by lawyers representing the defendants (actions which, in the plaintiffs' view, make pellucid that the legislature's sole purpose was to keep the retail liquor industry from being dominated by a few mega-players wielding nationwide market power). Based on these isolated snippets, the plaintiffs urge us to hold that the real goal of the statutory scheme is economic protectionism.

The district court declined to make that quantum leap, and so do we. The words of a legislative body itself, written or spoken contemporaneously with the passage of a statute, are usually the most authoritative guide to legislative purpose. See, e.g., Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 463 n.7, 471 n.15 (1981); Houlton Citizens' Coal., 175 F.3d at 191. The purpose of the 2004 amendments, as articulated in the statute itself, is to "promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing." R.I. Gen. Laws § 3-5-11.1(a). To put this statement of purpose into perspective, it should be recalled that the prohibitions against franchise and chain-store arrangements in the retail liquor industry are part of Title 3 of the Rhode Island General Laws. Title 3's stated purpose is the "promotion of temperance and for the reasonable control of the traffic in alcoholic beverages." Id. § 3-1-5. The plaintiffs have not proffered any convincing reason for doubting these formal statements of legislative purpose.

To be sure, the plaintiffs try. The centerpiece of their effort is the State's so-called admission that the 2004 amendments were not intended to promote temperance. That brazen claim relies on the State's answer to an interrogatory, which clarified that the State was not planning to argue in the district court that the amendments had actually reduced the consumption of alcoholic

-23-

beverages. We are hard-pressed to see how that interrogatory answer, which merely narrowed the field as to the issues that the State was planning to emphasize at trial, in any way vitiates the General Assembly's clear statements of overall legislative purpose.

The remainder of the plaintiffs' evidentiary cache consists of two statements of counsel. The first is a comment by counsel for the intervenor-defendant — a trade association, not a state agency — about the need to count out-of-state entities in the chain-store calculus lest a "giant, behemoth, nationwide liquor retailer . . . quickly dominate the entire market with [its] nationwide market power, thereby completely undermining in one fell swoop the purpose of the law, which is to treat all Class A license holders equally." The second is an offer of proof tendered by an attorney for the State in connection with a rebuffed exhibit, which was designed to supply background for the General Assembly's decision to structure the retail liquor industry without any chain-store "entity controlling the business in a number of different locations." To say that these statements override — or even weaken — the legislature's formal statements of purpose would be to elevate hope over reason.

What we have said to this point fully answers the plaintiffs' questions about the General Assembly's intent. On this record, we have no choice but to reject the construct that enactment of the overall statutory scheme was driven by a

discriminatory purpose.  See generally Fireside Nissan, Inc. v. Fanning, 30 F.3d 206, 218 (1st Cir. 1994) (finding protection of consumers against perceived "harmful franchising practices" to be a legitimate legislative objective).

The plaintiffs' claim of discriminatory effect is equally unavailing.  Here, too, the plaintiffs must carry the devoir of persuasion.  See Alliance of Auto. Mfrs., 430 F.3d at 40.  After a full trial, the district court found no compelling evidence of discriminatory effect.  Because that finding is not clearly erroneous, it commands our respect.  See Fed. R. Civ. P. 52(a).

The plaintiffs' principal rejoinder rests on an overly expansive reading of our decision in Walgreen Co. v. Rullan, 405 F.3d 50 (1st Cir. 2005).  In that case, the challenged statute exempted existing pharmacies (roughly 92% of which were locally owned) from compliance with a set of facially neutral statutory requirements.  Id. at 55-56.  The statute also allowed those "grandfathered" pharmacies to wield great influence in the enforcement of the statutory requirements vis-à-vis new entrants. Id.  Statistical data adduced at trial "strongly indicate[d]" that the statute suppressed competition and favored local interests. Id. at 56.

The instant case is easily distinguishable from Walgreen. Here, the plaintiffs adduced no evidence that the prohibition on franchise and chain-store arrangements, in itself, has had, or

threatens to have, a debilitating or unfair impact either on competition in general or — leaving aside residency requirements — on out-of-state enterprises in particular. There is, for example, no evidence of any carve-out or other device that would enable in-state entities to evade the challenged restrictions, nor is there any hint of a home-field advantage in connection with the State's enforcement of the restrictions. The absence of any such evidence is telling. See, e.g., Exxon Corp. v. Gov. of Md., 437 U.S. 117, 125-26 (1978) (rejecting unsubstantiated argument that effect of evenhanded proscription against refiners was "to protect in-state independent dealers from out-of-state competition"); see also Lewis v. BT Inv. Mgrs., Inc., 447 U.S. 27, 42 (1980) (discussing Exxon and terming the absence of discrimination between interstate and local competitors "a most critical factor").

Notwithstanding this lack of evidence, the plaintiffs asseverate that evenhanded laws that apply to in-state and out-of-state entities alike nonetheless may produce a discriminatory effect, in violation of the dormant commerce clause, if they "favor a subset of in-state interests." Walgreen, 405 F.3d at 58 (citing C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 391 (1994)). This asseveration can be dispatched quickly. Leaving to one side the residency requirements, see supra Part III(A), the

statutory scheme at issue here does not favor in-state interests at all.[4]

To this, we add one further observation: that a state regulation that burdens some interstate firms "does not, by itself, establish a claim of discrimination against interstate commerce." Exxon, 437 U.S. at 126 (footnote omitted). Thus, the fact that the mosaic of state laws enacted by the General Assembly may have had a negative impact on W&S's business model is, in itself, insufficient to show discriminatory effect.

This brings us to the claim that the statutory scheme has an impermissible extraterritorial reach. The district court did not address this claim, presumably due to shortcomings in the manner of its presentment. Even assuming that this argument was squarely presented, it does not profit the plaintiffs' cause.

A statute is per se invalid if it "regulates commerce wholly outside the state's borders or when the statute has a practical effect of controlling conduct outside of the state." Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 311 (1st Cir. 2005)

---

[4]The plaintiffs also make a rather feeble argument that the statutory scheme discriminates by exempting certain types of in-state establishments, such as wineries and brewpubs purveying locally produced wine and beer, from the franchise and chain-store prohibitions. See R.I. Gen. Laws §§ 3-5-11(a), 3-5-11.1(a). But there has been no showing here either that these kinds of business establishments are similarly situated to package stores or that their claimed exempt status has "deprive[d] out-of-state businesses of access to a local market." C & A Carbone, 511 U.S. at 389. Consequently, we reject the argument out of hand.

(quoting Pharm. Research & Mfrs. of Am., 249 F.3d at 79). The argument sketched by the plaintiffs on this point is that the statutory scheme dictates that businesses must abandon (or refrain from entering into) out-of-state franchise and chain-store arrangements in order to be eligible for a Rhode Island retail liquor license. That bare claim, without more, fails to pass muster. The plaintiffs have not explained how the commercial activity identified is "wholly outside" the State's boundaries nor have they explained why the force exerted by the statutory scheme, with respect to out-of-state conduct, can fairly be described as "control." This sophisticated area of law requires developed argumentation, with evidentiary support. Cf. Beer Inst., 491 U.S. at 337 n.14 (labeling as a "critical consideration" regarding extraterritorial reach claims the "overall effect of the statute on both local and interstate commerce"). On the sketchy arguments asserted by the plaintiffs, we are unable to say that the scheme "necessarily requires out-of-state commerce to be conducted according to in-state terms." Pharm. Care Mgmt. Ass'n, 429 F.3d at 311 (quoting Cotto Waxo Co. v. Williams, 46 F.3d 790, 794 (8th Cir. 1995)).

Leaving residency strictures to one side, see supra Part III(A), the most that the plaintiffs have shown is that the neutral, evenhanded requirements that we have been discussing incidentally burden interstate commerce by precluding various methods of

distribution in the retail liquor market. That is not enough. In order to invalidate the requirements, any such burden would have to be "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142.

Here, the hoped-for local benefits consist primarily of regulating and safeguarding against anticompetitive behavior in the retail liquor market. See R.I. Gen. Laws § 3-5-11.1; see also Heald, 544 U.S. at 488-89; Wine & Spirits, 418 F.3d at 51, 54. The corresponding burdens on interstate commerce are minimal. Again leaving to one side the residency requirements, see supra Part III(A), the plaintiffs have identified only two conceivable burdens: a loss of flexibility in arranging business affairs and a less-than-optimally-efficient distribution system for alcoholic beverages that have traveled through interstate commerce. Even accepting that these are real burdens, the plaintiffs have the obligation of proving excessiveness, see Pharm. Care Mgmt. Ass'n, 429 F.3d at 313 — and they have not come close to showing that the burdens they envision are excessive in relation to the statutory scheme's legitimate goals.

We need not tarry. The Supreme Court previously has rejected the notion that the dormant commerce clause protects particular business structures or methods of operation in retail markets. See Exxon, 437 U.S. at 127. The plaintiffs' argument that consumers would be advantaged by unregulated competition in retail

liquor sales, like the argument rejected in Exxon, "relates to the wisdom of the statute, not to its burden on commerce." Id. at 128. It is, therefore, of little moment. The bottom line is that the plaintiffs have failed to prove a violation of the dormant commerce clause.

## IV. THE EQUAL PROTECTION CLAIM

In a last-gasp effort to stem an unfavorable tide, the plaintiffs advance an equal protection challenge to the statutory scheme. This challenge presents something of a moving target; its specifics have been in constant flux during the course of the litigation. At this juncture, the challenge has morphed into an assault on the legitimacy of the State's interest in enacting the statutory scheme.

We apply rational basis scrutiny to equal protection challenges to economic legislation. See Wine & Spirits, 418 F.3d at 53 (citing Hodel v. Indiana, 452 U.S. 314, 331 (1981)). Using that level of scrutiny, economic legislation will be upheld as against an equal protection challenge if "the means chosen by the legislature are rationally related to some legitimate government purpose." Id. Refined to bare essence, the plaintiffs' current challenge is yet another iteration of their by-now-discredited claim that the Rhode Island General Assembly's principal concern in enacting the amendments was economic protectionism. As we previously have made clear, the plaintiffs' underlying premise —

that economic protectionism is the primary justification for Rhode Island's statutory scheme — is incorrect.  See supra Part III(B). Contrary to the plaintiffs' rodomontade, the State has not "freely admit[ted]" that motivation, nor have the plaintiffs identified any evidence that fairly supports it.  Accordingly, we reject the plaintiffs' ipse dixit and affirm our preliminary conclusion that no cognizable equal protection violation has been demonstrated.  See Wine & Spirits, 418 F.3d at 53-54.

## V.  CONCLUSION

We need go no further. State legislatures acting in the public interest are entitled to considerable deference in mapping the contours of economic legislation.  While that deference must take full account of constitutional constraints, the Rhode Island General Assembly has not crossed any constitutional boundaries here. Accordingly, we uphold the judgment below.


**Affirmed**.